**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.:  20-cr-91 (ADM/LIB) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **DEFENDANT'S SENTENCING** |
| | ) | **POSITION** |
| BRYAN DALLAS CRANDALL, | ) | |
| | ) | |
| Defendant. | ) | |

## I.     INTRODUCTION

Bryan Crandall, a third-generation farmer, pleaded guilty to a single conspiracy count pursuant to 18 U.S.C. § 371 for his participation in a scheme by CHS employees to falsely report grain sales to CHS in exchange for kickback payments.  Bryan cooperated with federal authorities during the investigation, provided incriminating information about himself, and pleaded guilty to an Information, sparing the Government the need to seek a Grand Jury Indictment and the resources required to proceed to a jury trial.  Bryan accepted responsibility for his role in the offense because he feels terrible about what he did.  He regrets the harm he caused CHS, his family, and himself and is ashamed to have strayed from the values instilled in him by his parents and grandparents.  Disclosing his crime to his father and recently-deceased mother was painful.  Having to tell Courtney, his wife and best friend, was worse.  Knowing that his four-year old son Beau—the fourth-generation Crandall farmer—may also suffer for his crime is nearly unbearable.

In fashioning an appropriate sentencing, we ask the Court to consider Bryan as the person he is today, and not to define him by the mistakes he made over five years ago.

Bryan must hold himself to a higher standard now because he is responsible for people who rely on him.  Bryan is responsible to his father, whose failing health precludes him from running the family farming operation, Crandall Farms, alone.  Bryan is responsible to his wife, who contributes to Crandall Farms but also has her own career as a small business owner and Emergency Medical Technician.  Bryan is responsible to his son, who loves him and relies on him to be his dad every single day.  Bryan is also responsible to pay restitution to return what he wrongfully took from CHS.

Bryan is a farmer born into farming.  It is what he has always been and has always wanted to be.  Farming is the only thing he knows how to do and the sole means he has to provide for himself and his family—and Crandall Farms is the only means by which Bryan will ever be able to pay restitution to CHS.  If the Court sends Bryan to prison, this 900-acre farm will necessarily be run by his elderly father, who has significant health limitations, and his wife, who would be forced to give up her career to run the operation as a single parent to a young child.  Without Bryan, Crandall Farms would likely fail.  Everything Bryan's grandparents and parents worked their entire lives to create would be lost, as would Beau's potential future of continuing this family legacy, if chosen.  Everyone loses if Bryan loses the farm.

The defense respectfully requests that the Court grant a downward variance and sentence Bryan to a term of probation and home confinement.  The unprecedented global COVID-19 pandemic has required the entire world to adjust.  We ask the Court to do the same.  The virus has spread throughout the Federal Bureau of Prisons ("the Bureau").  It cannot be contained, and the risk of exposure to Bryan in prison is far greater than in the

isolated setting of Crandall Farms.  To Bryan, however, the real fear is of complete separation from his family.  To mitigate against the spread of COVID-19, the Bureau took the unprecedented step of stopping all in-person visitation with inmates until late September 2020.  Visitation—a privilege extended even to premeditated murderers—is a recognized means to stay connected with one's outside support system, and is critical to re-integration and the prevention of recidivism.  Although the Bureau is currently permitting some form of visitation (a decision that was announced only a few weeks ago), it is uncertain how long this will continue and, regardless, visitation poses a significant risk to the health of visitors, like Bryan's family.  Unlike anyone who has ever been sent to prison for fraud in this district prior to 2020, therefore, Bryan will be denied safe, in-person visitation from his recently widowed father, his innocent wife, and his four-year old son.

Bryan will not avoid punishment for his crime.  No matter the Court's sentence, the pain Bryan has inflicted on himself and his family members will remain long after he has served it.  Bryan will always be a felon.  He will never be able to vote.  He will never be able to hunt—a family pastime—or take his son hunting.  He is an outcast in the small farming community in which he has lived his entire life.

In this case, imprisonment would compound the damage and would not serve the interests of justice.  The defense respectfully moves the Court for a downward variance to a sentence of probation and home confinement as sufficient, but not greater than necessary, to serve the statutory ends of sentencing per 18 U.S.C. § 3553(a), based upon:  (1) Bryan's history and characteristics, including the unique circumstances being necessary to operate the family farm; (2) the importance of paying restitution to CHS, which is unlikely if Bryan

cannot farm; (3) the disproportionate effect incarceration would have on Bryan's family; (4) his heartfelt acceptance of responsibility, as demonstrated by his cooperation with authorities and resolution via Information; (5) his lack of physical health, mental health, and substance abuse issues; (6) the need to avoid unwarranted sentencing disparities; and (7) the likely restrictions on visitation and danger to health posed by the presence of COVID-19 throughout the Bureau.

## II.    SENTENCING GUIDELINES FACTORS

The presentence investigation report ("PSR") recommends a total offense level ("TOL") of fifteen (*i.e.*, base offense level of six per U.S. Sentencing Guidelines Manual § 2B1.1(a)(2), plus twelve levels due to loss between $250,000 and $550,000 per § 2B1.1(b)(1)(G), minus three levels for acceptance of responsibility per § 3E1.1.  (PSR ¶¶ 9-10.)  Together with a criminal history category ("CHC") of I based upon one criminal history point, Probation recommends an advisory Guidelines range ("AGR") of fifteen to twenty-four months and a fine range of $7,500 to $75,000.  (PSR ¶ 74, 83.)  The supervised release term is one to three years per § 5D1.2(a)(2).

## III.    SENTENCING OPTIONS

Probation is an available option.  The defendant is eligible for not less than one or more than five years' probation because the offense is a Class D Felony.  A sentence of probation would require a variance from the Sentencing Guidelines because the applicable range is in Zone D of the Sentencing Table.  U.S. Sentencing Guidelines Manual § 5B1.1, cmt n.2.  The Court would be required to impose a fine, restitution, or community service should it determine that a probationary sentence is "sufficient, but not greater than

4

necessary" to fulfill the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). Here, restitution is a particularly appropriate condition of probation.

## IV.    18 U.S.C. § 3553(a) FACTORS SUPPORT A SENTENCE OF PROBATION

### a.  The History and Characteristics of Bryan Crandall (18 U.S.C. § 3553(a)(1))

Bryan Crandall is a thirty-six-year-old farmer from Herman, Minnesota. He is the youngest of six children born to parents Edwin and Kathleen. Born in nearby Wilmer, Bryan grew up on the site of the homestead where he now lives, works, and raises his family. He has never lived anywhere other than his childhood home in Herman. A third-generation farmer, Bryan is the only one of his siblings to pursue a career in agriculture and continue the farming operation his grandfather began following his discharge from the Service upon his return from World War II. (PSR ¶ 48.)

Bryan's childhood was mostly idyllic, although not without its challenges. He grew up in rural Minnesota on a farm surrounded by people who loved and cared for him. His father, Edwin, was a livestock and grain farmer. His mother, Kathleen, had a nursing career while also participating in farming operations. His grandparents lived and worked on the same acreage and were active in raising Bryan and his siblings. Bryan's material and emotional needs were always met. He could not have asked for better parents.

Bryan dreamed of being a farmer since he was a young child, when he watched his father follow in his grandfather's footsteps and slowly take over the family farm. Bryan was completely immersed in farm life. Even as a very young child, he cared for livestock, drove farm machinery, and participated in planting and harvesting. When Bryan was in

approximately third grade, his father was seriously injured in a vehicle accident and was unable to work on the farm. As a result, eight-year-old Bryan and his older brother became responsible for the entire operation, working before and after school while their father recuperated. Edwin Jr., who has never fully recovered from those injuries, is grateful to Bryan to this day.

In addition to the challenging circumstances of his father's injuries, Bryan experienced difficulties in middle school due to his weight. Bryan was a heavy child, at one time weighing nearly 300 pounds. As a result, he was subjected to teasing and bullying, as well as verbal and physical assaults. In part due to this treatment, Bryan eventually lost a considerable amount of weight through unhealthy means. Things were better for Bryan in high school. He became involved in extracurricular activities, including theater and an independent work program with the local farm implement dealer. But the activity with the greatest impact on Bryan was his participation in Future Farmers of America (FFA). FFA, a leadership program, was coordinated by a dedicated teacher named Chad Bruns, who spent a lot of time teaching his students about livestock and horticulture. Mr. Bruns saw Bryan work hard with his team, winning various competitions. Bryan still remembers participating in the Minnesota State FFA competition in the Twin Cities. Bryan considers Mr. Bruns to be a very positive influence in his life and an important part of his high school experience—the two remain friends to this day.

Bryan graduated from Herman Norcross High School in May 2002 and thereafter attended Alexandria Technical College in pursuit of a welding degree. Bryan did not move away from the farm, but instead commuted the approximately fifty miles to campus.

Unfortunately, an eye condition made it medically impossible for him to continue to weld, forcing him to leave the program after six months.  Subsequently, Bryan continued to live at home and began working at various farm-based businesses.  He also worked for area farmers and assisted his parents on the family farm.  Eventually, Edwin Jr.'s health and advancing age required Bryan step up once again and assume greater responsibility.  He began working on the family farm full time.  In 2012, the Crandalls created Crandall Farms—a joint venture between Bryan and his parents consisting of approximately 900 acres.  Bryan also does custom farm work for other farmers, including planting, tilling, harvesting crops, bailing hay or alfalfa, mowing grass, trenching dredge ditches, and other work involving heavy farm equipment.  Bryan has realized his childhood dream:  he is a farmer.

Bryan met his wife Courtney in 2008.  They began dating and were married in Traverse County, Minnesota on June 22, 2013.  Bryan describes Courtney as the "rock of the family" and his best friend.  Edwin Jr. refers to Courtney as the best daughter-in-law anyone could ever hope for.  Like Bryan's mother Kathleen, Courtney is an active participant in the farming operation.  She knows how to operate heavy equipment, like tractors, combines, and grain trucks, and is an integral part of the incredibly busy fall harvest.  But also like Kathleen, Courtney has independent career aspirations.  She is a volunteer Emergency Medical Technician for Sanford Medical in Wheaton, Minnesota.  She is a regular volunteer at Broadway Industries, an organization that helps find jobs for disabled adults.  Courtney also runs a store called KaCo's Little Shop in Sisseton, South Dakota—a business she used to co-own with Bryan's mother, Kathleen—and runs an

online store out of her home, using a building on Crandall Farms as a warehouse from which she ships goods across the United States.

A little over four years ago, Bryan and Courtney had their only child, Beau Dallas Crandall. Beau changed everything. He is a bright and earnest four-year-old boy whose face lights up when he sees a car coming down the long driveway. He is excited to tell everyone he meets about tractors, his cats, and his favorite television shows, and is known to give hand-painted rocks to unsuspecting guests as gifts. As Courtney can attest, becoming a father has completely changed Bryan's focus; he loves being Beau's dad above all. Beau is beginning his childhood as his father did—on the same farm in the same countryside, surrounded by people who love and care for him. Beau's grandparents' home is on the same property, just as it was for Bryan. Beau and Bryan spend every single day together. Although Courtney and Bryan share parenting duties, because many of Courtney's pursuits are away from the farm, Bryan is the primary caregiver for Beau during the day and Courtney's evening and weekend EMT shifts. Bryan and Beau spend their days in the barns, out in the fields, and visiting Grandpa Ed. Beau dreams of being a farmer, just like Bryan did when he was his age.

Tragedy struck the Crandall family on June 17, 2020, when Bryan's mother Kathleen unexpectedly died at age sixty-eight from an infection contracted following a mole removal procedure. Edwin Jr., who was married to Kathleen for forty-eight years, continues to be distraught over her death. Bryan sees his father every day and is now responsible for assisting him with daily tasks, like taking his diabetes medication, and

8

providing emotional support.  It haunts Bryan that his mother died knowing he committed this offense and worrying about the impact it would have on their family.

Bryan's unique family circumstances support a downward variance to probation and home confinement.  First, Bryan is the family's primary means of financial support. Although Courtney contributes to the family's finances, the Crandall family depends on Bryan to pay its bills.  Second, Crandall Farms—and the family farming legacy—depends on Bryan.  This 900-acre operation requires year-round attention, particularly during the fall harvest.  Although Courtney assists with the operation, she is unable to do the heavy maintenance required of a grain producer, and also has other obligations, including her own business, which will fail if not attended to, and her four-year old son.  For his part, Bryan's father's declining health precludes him from taking the primary role.  Edwin Jr.'s assessment was straight forward:  without Bryan, Crandall Farms will fail. (PSR ¶ 53.) Such failure would punish not only Bryan, but his entire family, and would end a family heritage established after WWII.  Third, Bryan's father, Edwin Jr., depends on Bryan. They have been around each other their entire lives.  Edwin Jr.—recently widowed, despondent, and in poor health—relies on Bryan to take care of him.  Bryan visits Edwin every day, ensuring he is taking his medication and coping with the sometimes overwhelming loneliness of losing his wife of forty-eight years.  If Bryan is incarcerated, his father will struggle.  Finally, Bryan's wife and son depend on him.  Bryan shoulders most of Beau's childcare responsibilities while Courtney attends to her career outside of the farm.  Incarcerating Bryan would make Courtney a single mother facing the possibility

of letting her business fail and watching Crandall Farms fail, all while helping Beau understand his father's sudden departure.

### b.  The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

As noted in the PSR, this was not a particularly sophisticated conspiracy.  (PSR ¶ 25.)  In simple terms, the insider CHS employees agreed to falsify records that they knew their employer would rely upon to pay a grain producer for corn and soybeans that were never actually delivered.  In exchange, the producer was expected to provide kickback payments to the CHS insiders.

The victim, CHS, is a global agribusiness that employs approximately 11,000 people, operates in sixteen states, and markets over two billion bushels of grains and fifty-two million metric tons of seeds to customers in more than sixty-five countries worldwide.  CHS' operations include oil refineries, ethanol plants, and one of the largest trucking operations in the world.  About CHS, https://www.chsinc.com/about-chs (last visited October 27, 2020).  It is traded on the NASDAQ stock exchange and has consistently reported net revenues exceeding $30 billion per year since 2015.  2019 CHS Annual Report, at 10-17, https://www.chsinc.com/about-chs/owners-and-investors (follow "2019 CHS Annual Report" hyperlink).  The offense conduct occurred at the site of CHS' grain elevator in Herman, Minnesota, just miles down the road from another massive, state-of-the-art facility that CHS opened on a sprawling fifty-seven acre site less than two weeks ago. *Herman Elevator Complete and Receiving Grain*, (Oct. 16, 2020), https://www.chs-herman.com/about-us/news/herman-elevator-complete-and-receiving-grain.

In a typical grain transaction, the farmer will drive a loaded truck onto a scale at the elevator.  The scale weighs the transport truck as it entered the facility with a load.  The cargo is then unloaded and the truck is re-weighed.  The total amount of grain delivered is calculated with a computer using the "gross" (incoming) and "tare" (post-delivery) weights and adjusting for the type of grain and moisture present.  The farmer is then paid by CHS based on a previously agreed price or the spot market price, depending on the arrangement. (PSR ¶ 9.)

At the Herman elevator, scale operators were permitted to make manual adjustments to the scale readings.  This feature, which was meant to permit corrections of errors in the weighing process, unfortunately created a unique opportunity for fraud.  The override feature allowed the scale operator not only to manipulate readings when an actual delivery was made, it allowed the CHS employee to enter completely fictitious readings.  (PSR ¶ 10.)

Some time prior to August 2013, a thirty-two-year-old CHS employee named Lee Backman approached Bryan and suggested that he become involved in the insider kickback scheme.  While he initially declined, Bryan eventually began willingly participating.  (PSR ¶ 22.)  From August 2013 until his untimely death in December 2016, Backman repeatedly used the scale override feature to falsify his employer's records and make it appear that Bryan had deposited non-existent loads of corn and soybeans.  As a result, Bryan received payments from CHS to which he was not entitled.  Per their agreement, Bryan provided kickback payments to Backman—nearly $187,000.00 over approximately three years. After Backman's death, another CHS insider, scale operator Derek Hittle, took over

Backman's position falsifying scale records.  Hittle received kickback payments totaling $21,271.00 from January through April 2017, which is roughly the same pace of fraud as Backman.  (PSR ¶ 16.)

Bryan's role in this offense should be taken into consideration in the context of his variance request.  By simply accurately describing the parties and the various roles of the conspirators, the defense is not attempting to blame the victim or shift responsibility to another.  Bryan has accepted responsibility for his criminal conduct.  He cooperated with the authorities, provided information against himself, and pleaded guilty to an Information.  He feels terrible about what he has done and has taken accountability for his actions.  And he is the *only* person to acknowledge any accountability in this matter.

Although CHS is entitled to be upset, the Court should scrutinize CHS' characterization of Bryan's offense and his relationship with the CHS insiders.  Any suggestion that Bryan was the architect of this fraud scheme is illogical and unsupported by the record before the Court.  This was an inside job—a scheme devised by CHS employees to benefit CHS employees using CHS-created records.  There is no evidence that Bryan "targeted and preyed upon" Derek Hittle, as CHS claims, or anyone else.  (PSR ¶ 20.)  Rather, Bryan maintains that CHS' employee, Lee Backman, approached him with this kickback scheme.  Having never worked for CHS or any other grain elevator, (PSR ¶¶ 65-69), Bryan, would not have known that CHS grain scale operators had the capability to alter grain scale records.  He would not have known that CHS lacked the supervisory control over their employees such that they could easily falsify such records.  Or that CHS would not question the number of manual entries from the same operator at the Herman

facility over several years despite apparently possessing computerized records showing where manual entries were made.  Only a CHS insider would have known that this scheme was technically possible and that such a massive grain shortfall could go unnoticed and undetected.[1]  In fact, CHS *never* noticed that anything was missing until law enforcement brought it to its attention.

This crime could not have occurred without access to and the ability to falsify CHS' records and Bryan had neither.  Although a willing participant, he was not essential to the fraud scheme like the CHS insiders.  Bryan's role could be filled by any farmer-producer.  Bryan's lessor role is also demonstrated by his text messages with Backman, who directed Bryan's activities.  In one instance, Backman told Bryan to wait to haul his father's grain because he preferred not to split names between elevators.  (PSR ¶ 12(f).)  Backman told Bryan when to come to the elevator, how many fraudulent grain tickets he falsified, and how much to deposit into his accounts.  (PSR ¶ 12(a) & (b).)  Bryan was not even aware that certain fraudulent activity was taking place until Backman specifically told him:  "Nice to see your (sic) hauling today, got 3 in so far."  (PSR ¶ 12(e).)  In other instances, Backman informed Bryan of the fraud after the fact by simply texting the number of fake loads he created.  (*See* PSR ¶ 12(f) ("2").)  Backman alone had the final say regarding how many false load records to generate and what type.  (*See* PSR ¶ 12(e) ("Backman told Crandall he entered four loads and was going to try and get four each of corn and beans (for a total

---

[1] Using $4.00 per bushel for corn and $12.00 per bushel for soybeans, which are very rough averages, and estimating 1,000 bushels per semi-truck, the loss amount of $416,389.00 represents 104 truckloads of corn or thirty-five truckloads of soybeans.

of eight) . . . . Crandall asked Backman if he is going to keep going and Backman stated he isn't sure . . . . Crandall told Backman to decide if he wanted to do more . . . . Backman stated he entered eleven loads that day, all of which were corn.")

The defense also respectfully disagrees with CHS' somewhat pitched characterization of Bryan.  Bryan is guilty of fraud and he is ashamed of his conduct.  But the claim that his actions were "a level of abhorrent behavior that CHS has never experienced in our 80+ years of business" is an apparent overstatement at best.  CHS is well-acquainted with recent examples of bad conduct.  For example, in October 2018 a CHS employee's "intentional misconduct" caused CHS to overstate its pretax profit by as much $190 million over the past four fiscal years.  *See* CHS, Inc., Current Report (Form 8-K) (October 26, 2018).  CHS acknowledged that the misstatements were material, and that "the control deficiencies that failed to detect the misconduct, misstatements and accounting errors . . . constituted a material weakness in internal control over financial reporting . . . ."  *Id.*  Such wildly overstated profits potentially misled numerous investors and creditors.

Also in 2018, CHS accused one of its former top managers of self-dealing and an alleged conflict of interest with a major Mexican grain broker.  *See CHS, Inc. v. Martinez,* No. A18-1241, 2019 WL 1233387 (Minn. Ct. App. Mar. 18, 2019).  According to the civil complaint, the former manager helped grow a relationship between CHS and a Mexican broker that conducted "tens of millions of dollars of business per year" amounting to hundreds of millions of dollars between 2010 and 2018.  Complaint ¶¶ 21, 27, *CHS, Inc. v. Martinez*, No. 62-CV-18-1076, 2018 WL 6084595 (Minn. Dist. Ct. Feb. 20, 2018).  Not

14

only did this CHS employee fail to disclose his financial ties to the broker, according to CHS' complaint, he assisted with or assented to the fabrication of charges to CHS by the broker that were never rendered and "then stood by while CHS paid [broker] for those (unrendered) services." *Id.* ¶ 28.

And this bad behavior is not limited to one-off conduct by rogue employees: CHS itself is currently under investigation by the Securities and Exchange Commission after disclosing to the Department of Justice potential violations of the Foreign Corrupt Practices Act ("FPCA") related to CHS employees making payments to Mexican customs officials in connection with inspections of grain crossing the U.S.-Mexican border by railcar. *See* CHS, Inc., Quarterly Report (Form 10-Q) (Apr. 8, 2020). The Department of Justice declined to take criminal action, but the SEC investigation into this issue and "other areas of potential interest relating to the FPCA" continues. *Id.*

Although the victim's perspective in this matter should certainly be considered, we ask the Court to take a more objective view when evaluating the nature and circumstances of the offense. Bryan committed a crime for which he is *solely* being held accountable. He benefitted financially, but as an initially reluctant participant—not the mastermind. Bryan was not in a position to determine the type, scope, and magnitude of the fraud. His role in the offense was lessor in comparison with that of his co-conspirators and supports a downward variance.

c.  **The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment (18 U.S.C. § 3553(a)(2))**

Placing Bryan on probation with home confinement, restitution, and other appropriate conditions would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  Not all defendants must be imprisoned to be duly punished, and "[h]ome detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive." *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008).  The United States Supreme Court has described probation as a "substantial restriction of freedom," explaining:

> Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

*Gall v. United States,* 552 U.S. 38, 48 (2007) (internal citations omitted).

As a convicted felon, Bryan will forfeit his right to vote and his Second Amendment rights.  He will be subject to a significant restitution award.  Probation supervision will provide the additional "substantial restriction of freedom" associated with punishment for having committed a serious but non-violent financial crime.

### d. The Need to Avoid Unwarranted Sentence Disparities (18 U.S.C. § 3553(a)(6))

A probationary sentence for Bryan would also "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6); *see also United States v. Ruelas-Mendez*, 556 F.3d 655, 658 (8th Cir. 2009) (holding district courts are not "forbidden to consider the guidelines and the need to avoid unwarranted sentence disparities when exercising its discretion;" to the contrary, "the governing statute directs the sentencing court to consider these matters as two factors among several in the sentencing process") (internal citations omitted).

A probationary sentence is consistent with defendants with similar records facing comparable charges in the District of Minnesota:

| Case No. | Charge | TOL | CHC | AGR | Restitution Amount | Sentence |
|---|---|---|---|---|---|---|
| 08-384 (DWF) | Wire Fraud, 18 U.S.C. § 1343; Money Laundering, 18 U.S.C. § 1957 | 17 | I | 24-30 | $389,000.00 | Probation (4 years) |
| 10-18(2) (PAM) | Aiding and Abetting Mail Fraud, 18 U.S.C. §§ 1341 & 2 | 18 | I | 27-33 | $690,000.00 | Probation (5 years) |

| 10-165(2) (DSD) | Conspiracy to Commit Mail and Wire Fraud, 18 U.S.C. § 371 | 25 | I | 57-60 | $2,855,682.50 | Probation (3 years) |
| 11-145(3) (SRN) | Conspiracy to Commit Wire Fraud, 18 U.S.C. § 371 | 17 | I | 24-30 | $2,336,425.00 | Probation (3 years) |
| 12-204 (SRN) | Wire Fraud, 18 U.S.C. § 1343 | 16 | I | 21-27 | $352,539.58 | Probation (3 years) |
| 14-386(1) (SRN) | Food Stamp Fraud, 7 U.S.C. § 2024(b)(1) | 17 | II | 27-33 | $609,045.48 | Probation (4 years) |
| 12-279(3) (SRN) | Conspiracy to Commit Wire Fraud, 18 U.S.C. § 371 | 19 | I | 30-37 | $1,240,549.00 | Probation (2 years) |
| 16-201(2) (DSD) | Conspiracy to Commit Wire Fraud, 18 U.S.C. § 371 | 19 | I | 30-37 | $654,925.31 | Probation (3 years) |
| 16-338(4) (MJD) | Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349 | 17 | I | 24-30 | $316,140.00 | Probation (2 years) |
| 17-313(1) (DWF) | Conspiracy to Commit Theft of Government Funds, 18 U.S.C. § 371 | 15 | I | 18-24 | $431,449.07 | Probation (3 years) |

| 18-184(1) (PJS) | Wire Fraud, 18 U.S.C. § 1343 | 16 | I | 21-27 | $328,475.36 | Probation (3 years) |
|---|---|---|---|---|---|---|

A probationary sentence is consistent with the treatment of a number of other offenders in this District and would serve the ends of preventing unwarranted sentencing disparities. One may argue that the facts and circumstances of the above cases are unique and therefore incomparable. Of course, the most comparable case would be that of CHS employee Derek Hittle. Hittle actively participated in the very same scheme as Bryan and received thousands of dollars in kickback payments. But Hittle was never charged and it appears clear that he never will be.

## V.   THE PRESENCE OF COVID-19 IN THE PRISON SYSTEM JUSTIFIES A DOWNWARD VARIANCE TO PROBATION AND HOME CONFINEMENT

### a.   COVID-19 in the Bureau of Prisons

The COVID-19 pandemic is unprecedented in modern times. As of October 27, 2020, the United States has had over 8.7 million cases, with over 135,000 in Minnesota. *See* COVID-19 Dashboard, Johns Hopkins University of Medicine, https://coronavirus.jhu.edu/map.html (last visited October 27, 2020); COVID-19 Dashboard: Overview of Cases, State of Minnesota, https://mn.gov/covid19/data/covid-dashboard/overview.jsp (last visited October 27, 2020). To date, COVID-19 has resulted in nearly 478,000 hospitalizations in the United States (9,588 in Minnesota) and over 225,000 deaths in the United States (2,353 in Minnesota)—but these numbers are rapidly increasing. *See* COVID-19 Hospitalization Tracking Project, University of Minnesota

19

Carlson School of Management, https://carlsonschool.umn.edu/mili-misrc-covid19-tracking-project (last visited October 27, 2020); COVID-19 Dashboard: Overview of Cases, State of Minnesota, https://mn.gov/covid19/data/covid-dashboard/overview.jsp (last visited October 27, 2020). Although some who contract the virus suffer mild symptoms, like fever, cough, and body aches, the virus can cause severe symptoms including intense inflammation of the lungs, which may require the patient to use a ventilator to breathe. *See* James Gallagher, *Coronavirus: What it Does to the Body*, BBC News (Mar. 14, 2020), https://www.bbc.com/news/health-51214864. Other severe symptoms include septic shock and kidney failure, with the most severe patients requiring an artificial lung to oxygenate blood outside of the body. *Id*.

This risk of serious health issues and death caused by COVID-19 is dramatically increased for incarcerated persons. The constant flow of people entering and exiting prison facilities, including staff, incarcerated persons, visitors, and medical and legal professionals, presents a myriad of opportunities for the virus to enter a facility. *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Center for Disease Control (Oct. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. The Center for Disease Control's (CDC) Interim Guidance on Management of [COVID-19] in Correctional and Detention Facilities notes that inmates may be unable to exercise even the most basic disease prevention measures, like frequent handwashing, because many facilities restrict access to soap and paper towels and prohibit

alcohol-based hand sanitizer. *Id*. As of October 27, 2020, the Bureau has test-confirmed, active COVID-19 cases at 122 facilities and twenty-two residential reentry centers. COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited October 27, 2020). At present, 16,764 federal inmates have tested positive for COVID-19, and at least 128 inmates have died from it. *Id*. In Minnesota, at least four Bureau facilities are known to currently have confirmed, active cases, including FPC Duluth, where Bryan would likely be incarcerated—which currently has eleven. *Id*.

In response to this unprecedented crisis, the Department of Justice ("DOJ") and the Bureau have taken unprecedented action. The United States Attorney General has instructed the Bureau to transfer thousands of low-risk offenders like Bryan from prisons to home confinement. *See* Memorandum from the Att'y Gen. for the Director of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (March 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home _confinement.pdf; Memorandum from the Att'y Gen. for Director of Bureau of Prisons re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3 .pdf. So far over 7,700 inmates have been thus transferred. *See* COVID-19 Home Confinement Information, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited October 27, 2020).

**b.  The Risk to the Defendant's Health and Safety Justifies a Variance**

Indisputably, Bryan would be at far greater risk of contracting COVID-19 at FPC Duluth than in home confinement.  The Attorney General stated that candidates for home confinement must be less likely to contract COVID-19 on home confinement compared to incarceration.  *See* Memorandum from the Att'y Gen. for Director of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf.  FPC Duluth currently has nearly a dozen confirmed active cases of COVID-19.  *See* COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited October 27, 2020).  And St. Louis County, where FPC Duluth is located, has over 3,000 cases.  *See* COVID-19 Dashboard: Overview of Cases, State of Minnesota, https://mn.gov/covid19/data/covid-dashboard/overview.jsp (last visited October 27, 2020).

In comparison, Traverse County, where Bryan currently resides, has only fifty-seven cases—under two percent of the St. Louis County total. *Id.*  Courts in Minnesota and across the country have ordered inmates to be released from detention facilities due to risk from COVID-19 under similar circumstances—including from FPC Duluth.  *See, e.g.*, *United States v. Gutierrez*, No. 98-279(8), 2020 WL 3839831, at *1, *3 (D. Minn. July 8, 2020) (Tunheim, J.) (ordering inmate be released from federal corrections facility due to the presence of COVID-19 in that facility); *United States v. Alvarado*, No. 18-CR-283, 2020 WL 3041504, at *2-3 (D. Minn. May 27, 2020) (Brasel, J.) (ordering inmate be released from FPC Duluth to home detention due to the risk of contracting COVID-19);

*United States v. Stephenson*, No. 3:05-CR-00511, 2020 WL 2566760 at *6 (S.D. Iowa May 21, 2020) (granting compassionate release to an inmate at FMC Rochester after a single inmate or staff member tested positive for COVID-19). Bryan's home and family circumstances, including the extremely low rate of infection in his home county as compared to St. Louis County and FPC Duluth, support home confinement.

### c. Incarceration Would Deprive the Defendant and his Family Access through Visitation and Would Damage the Family Unit

The Crandalls only have each other. They live on the same property in Herman. They see each other every day. They rely on each other. Bryan's father is elderly, ill, and recently widowed. The recent and completely unexpected loss of Bryan's mother has left him despondent. If Bryan were incarcerated rather than placed in home confinement, his family would suffer irreparable harm either by risking COVID-19 infection from visiting him in prison or foregoing visitation altogether.

Visitation may not even be an option. If incarcerated, Bryan may be completely unable to see his wife, son, and father because prisons around the country have taken drastic steps to prevent the spread of the virus, including instituting a lockdown for prisoners to remain in their cells and suspending visitation. *See* Michael A. Foster & Nathan James, Cong. Research Serv., R46297, Federal Prisoners and COVID-19: Background and Authorities to Grant Release (Apr. 23, 2020); BOP COVID-19 Modified Operations Plan, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited October 27, 2020). Although the visitation suspension was recently lifted, it is likely to be reinstated given the rising numbers of COVID-19 cases in prisons. *See* BOP

COVID-19    Modified    Operations    Plan,    Federal    Bureau    of    Prisons,
https://www.bop.gov/coronavirus/covid19_status.jsp (last visited October 27, 2020).

Even if allowed, visitation would pose an unreasonable risk to Bryan's wife, son, and father.  So far, there have been seventeen inmates with positive COVID-19 at FPC Duluth, with eleven active confirmed cases at present.  *See* COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/  (last visited October 27, 2020).  As courts have recognized, the crowded nature of prisons presents "an outsize risk that the COVID-19 contagion, once it gains entry, will spread."  *United States v. Hernandez*, No. 18 CR. 834-04, 2020 WL 1684062 at *3 (S.D.N.Y. Apr. 2, 2020)*; see also*, *Stephenson*, 2020 WL 2566760 at *1, *6 ( "Already tinderboxes for infectious disease, prisons now are even more dangerous than we typically accept") (internal quotations omitted).  COVID-19 has already entered FPC Duluth.  Incarceration at this facility could result in Bryan serving his sentence in virtual lockdown, unable to see his family or console his grieving, ill father.

### d.  Bryan's Supportive Family Greatly Reduces His Risk of Recidivism

Bryan's    strong    family    connections    also    support    sentencing    him    to    home confinement based on the Attorney General's policies.  In his March 26 memorandum, the Attorney General stated that inmates who have a plan to prevent recidivism are more suitable candidates for home confinement.  *See* Memorandum from the Att'y Gen. to

Director of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf.  The importance of this factor is further emphasized by a recent District of Minnesota order amending a sentence to home confinement.  *See Alvarado*, 2020 WL 3041504, at \*2-3.  In *Alvarado*, the court highlighted the petitioner's supportive family as evidence that he is not a danger to society and has a low likelihood of recidivism.  *Id*.  If placed in home confinement, Bryan's likelihood of recidivism is extremely low.  He would return home to a supportive family with a plan to work and pay reparations for his crime.

The Attorney General also emphasized that non-violent offenders should be prioritized for transfer to home confinement.  *See* Memorandum from the Att'y Gen. to Director of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf).  Bryan's crime, while serious, was not violent.  Therefore, he would be a priority candidate for transfer to home confinement if he were incarcerated.  Furthermore, a defendant's criminal history is an important factor in sentencing.  *See* 18 U.S.C. § 3553(a)(1); Office of General Counsel, U.S. Sentencing Commission, *Departures and Variances Primer* (Mar. 2020).  Although Bryan has had prior interactions with the criminal justice system, he has a criminal history score of one.

Bryan's supportive family circumstance, low risk of recidivism, and conviction for a non-violent offense all support sentencing him to home confinement.

### e. The Types of Sentences Available Supports Probation and Home Confinement

Courts must also consider the types of sentences available during sentencing. 18 U.S.C. § 3553(a)(3). Available sentences can range from a simple fine, to more complex probationary terms. *See* Office of General Counsel, U.S. Sentencing Commission, *Departures and Variances Primer* (Mar. 2020). In light of the COVID-19 pandemic and the actions taken by the DOJ and the Bureau to limit the spread of the disease, this factor also supports a downward departure to home confinement.

The Attorney General has instructed Bureau to immediately transfer non-violent offenders like Bryan from low or minimum security prisons to home confinement. *See* Memorandum from the Att'y Gen. to Director of Bureau of Prisons re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf. Following these instructions, the Bureau has already placed over 7,700 inmates on home confinement. *See* COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited October 27, 2020).

These actions clearly illustrate the DOJ and the Bureau's current preference for home confinement over incarceration for non-violent offenders. If incarcerated, Bryan would very likely be considered for transfer to home confinement. Rather than put further strain on the administrative processes of the Bureau and subject Bryan to an unpredictable

26

review process, he respectfully requests that the Court use its discretion to sentence him to home confinement at the outset.

### f.   The System Must Adapt to the Present Circumstances

Despite our wish to return to normalcy, the COVID-19 pandemic continues to be a reality and we must continue to take safety precautions until a vaccine is developed and deployed.  For the same reasons it is not reasonably safe to stand six feet apart in a large and mostly empty courtroom so that Bryan can make one of the most consequential decisions of his life, it is not safe to send him to prison.

## VI.   CONCLUSION

Bryan Crandall has accepted responsibility for his conduct.  He is remorseful and prepared to accept the Court's sentence.  The Defense requests the Court sentence Bryan to probation, restitution, and a period of home confinement so he can begin to make restitution to his victim, CHS, while preserving his family and way of life.  The consequences would be sufficiently harsh, proportionate, pragmatic, and would best serve the interests of justice.

**MASLON LLP**

Dated:  October 28, 2020            By:      *s/ Steven L. Schleicher*
                                                        Steven L. Schleicher (#0260587)
                                                        Stephanie M. Laws (#0396174)
                                             3300 Wells Fargo Center
                                             90 South Seventh Street
                                             Minneapolis, MN  55402-4140
                                             Telephone: (612) 672-8200
                                             Email:   steve.schleicher@maslon.com
                                                          stephanie.laws@maslon.com

                                             Eric John Olson (#278427)
                                             **OLSON LAW FIRM**
                                             8009 34th Ave. S.
                                             Suite 1492
                                             Bloomington, MN 55425
                                             Telephone: 952-835-1088
                                             Email: eric@olsondefense.com


                                             **ATTORNEYS FOR DEFENDANT**
                                             **BRYAN DALLAS CRANDALL**